UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KESHA LAWSHAWN MASTON, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 06-CV-0694-CVE-FHM |
| ) | |
| ST. JOHN HEALTH SYSTEM, INC., ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 25). Plaintiff Kesha Lawshawn Maston ("Maston") filed a complaint (Dkt. # 2) on December 22, 2006, alleging that defendant St. John Health System, Inc. ("St. John") terminated plaintiff's employment because of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq. ("Title VII"), and 42 U.S.C. § 1981. St. John now moves for summary judgment on the ground that the undisputed facts fail to establish any genuine issue of material fact. According to St. John, Maston was terminated because of insubordination and uncooperative conduct during the investigation of a mail order scheme. For the reasons set forth below, the Court **grants** the motion for summary judgment.

### I. Background

Plaintiff Maston, an African-American woman, began her employment with Regional Medical Laboratory ("RML"), a division of defendant St. John, as a data entry clerk in August 2001. Dkt. # 42, at 1. In May 2002, plaintiff moved to RML's billing office. Dkt. # 25, at 6. In the billing office, Lorinda Wear ("Wear") was the manager and plaintiff's supervisor. Id. Over the next three

years, Wear gave plaintiff good performance reviews and promoted plaintiff a total of three times. Id.; Dkt. # 25-3, at 3-4.

In March 2004, Wear promoted plaintiff to the position of team leader for the customer service team. Dkt. # 25, at 6. As team leader, plaintiff received a 57 cent pay increase to her hourly pay and continued to report to Wear, as did the other hourly team member employees. Dkt. # 25-2, at 4. She assumed additional duties of training new employees and attending management meetings. Dkt. # 25, at 6. Five team members reported to plaintiff, who acted as an intermediary between the customer service team members and Wear. Id.; Dkt. # 42-2, at 28. As team leader, plaintiff admits she did not have the authority to hire, fire, or promote any other employee. Dkt. # 42-2, at 28. Plaintiff remained a team leader until her discharge in 2005. Dkt. # 25, at 6.

The incidents leading to plaintiff's discharge began on Monday, September 12, 2005, when Wear received a past-due invoice from a mail order catalog company for $304.27. Id. at 7. Upon inquiry, the company informed Wear that orders had been placed by a "Felecia Vandiver" and that Destiny Taylor ("Taylor") and Georgia Bevenue ("Bevenue") had signed for the packages at delivery. Id. at 7-8. The following day, Tuesday, September 13, the director of human resources instructed Wear to contact security to begin an investigation. Id. at 7. Tim Thomas ("Thomas"), a Caucasian security officer employed by St. John, initiated the investigation. Id. Thomas interviewed and obtained statements from several RML employees. Id.

The investigation that day revealed that two Caucasian employees from the Medicare team, Djuana Welker ("Welker") and Taylor, had been involved in the initial ordering of items from the catalog company under the fictitious name, "Felecia Vandiver." See Dkt. # 25-2, at 8-9; Dkt. # 25-4, at 1; Dkt. # 25-5, at 7-8. These women denied any involvement in the past-due order, however. See

2

Dkt. # 25-4, at 13; Dkt. # 25-5, at 4-5. Thomas also interviewed plaintiff and Bevenue, a Caucasian member of plaintiff's team. See Dkt. # 25-5, at 1-3. Plaintiff and Bevenue completed witness statements, in which they both intimated that Welker and Taylor were responsible for the catalog order. Dkt. # 25-5, at 1, 3. Later that afternoon, the team leader for the Medicare team also sent an e-mail to Thomas. Dkt. # 25-5, at 6. The e-mail stated that Taylor had phoned the Medicare team leader "very upset" and told her that "a couple of weeks ago [Taylor] was told that [plaintiff] and [Benvenue] had ordered some things from [the catalog] under the bogus account in efforts to get [Welker] in trouble." Id. The Medicare team leader added that she did not know whether Taylor's statement was true. Id.

On Wednesday, September 14, 2005, Taylor phoned Thomas. Dkt. # 25, at 9. She told him that Bevenue had admitted to her that plaintiff and Bevenue "had placed an order with [the catalog]," but that Bevenue had become "scared about accepting the items from [the catalog] due to [the] on[-]going investigation into the bogus account." Dkt. # 25-5, at 9. As a result of Taylor's call, Thomas and Wear decided to interview Bevenue and plaintiff again. Id. During Bevenue's interview, Bevenue denied placing an order with the catalog, stated that she was being harassed, became very loud, evaded answering questions, and asked Thomas if she should retain an attorney before answering any additional questions. Id. at 10. As to plaintiff's interview, Thomas reported that plaintiff "also became evasive in her answers[,] [] said she had already been questioned about the incident and felt as though she was being harassed[, and ] . . . asked if she should get an attorney." Id. at 9. The parties dispute whether plaintiff's actions qualified as "evasive" or "insubordinate," and whether plaintiff asked if she should obtain an attorney before answering any questions from security. Compare id. with Dkt. # 42-2, at 13; Dkt. # 42-6, at 3. The parties do not dispute,

3

however, that plaintiff stated that she had already been questioned about the incident, that she felt as though she was being harassed, and that the interview upset her. Dkt. # 25-5, at 10; Dkt. # 42-2, at 13; Dkt. # 42-6, at 3. Thomas reported his findings to the human resources department. Dkt. # 25, at 10. Plaintiff claims that all of the questioned employees were employed under the same terms and conditions, as set forth in defendant's Employee Handbook. Dkt. # 42, at 6.

On Thursday, September 15, 2005, Wear met with Carol Ghere, RML's director and Wear's superior.[1] Wear and Ghere telephoned plaintiff at home and informed her that "she was being terminated for insubordination and not cooperating during an investigation." Dkt. # 25-2, at 5. Defendant's Employee Handbook lists "insubordination" as grounds for immediate termination and defines the term as the "willful refusal to follow direct orders." Dkt. # 42-7, at 3. The Employee Handbook also lists "Failure to cooperate with an investigation" as grounds for immediate termination. Id. As to Bevenue, Wear and Ghere terminated her for insubordination and failure to cooperate as well. Dkt. # 25, at 11. Wear completed written termination notifications both for plaintiff and Bevenue. On plaintiff's notification, Wear checked the "No" box under eligibility for rehire. Dkt. # 25-2, at 5. Wear stated that plaintiff had been discharged because she "became insubordinate with Tim Thomas and myself . . . . stat[ing] 'Do I need to write this down, so I don't have to keep repeating myself?' . . . [and] . . . 'Do I need a lawyer, I don't have time for this shit.'" Id. On Bevenue's notification, Wear checked the "No" and "Not in this Department" boxes under eligibility for rehire. Dkt. # 25-2, at 6. Wear stated that Bevenue had been discharged because she had not given complete answers, had "changed" answers, had told others about the questioning after

---

[1] Ghere approved the promotions and performance reviews made by Wear. Dkt. # 25-2, at 2.

4

being instructed not to do so, and had signed for packages in her name and Taylor's name. Id. at 6-7.

On Friday, September 16, 2005, RML discharged Taylor and Welker for their involvement in the catalog ordering scheme. Dkt. # 25, at 11. The following Monday, however, Wear and Ghere met with human resources to discuss reinstating Taylor and Welker, who had "cooperated in the investigation," because "it was felt that they were not involved in the current past-due invoice matter, and . . . had paid for any items that they previously ordered." Id. RML subsequently reinstated Taylor and Welker. Id.

Plaintiff alleges that her Caucasian supervisors, Wear and Ghere, racially discriminated against her and other African-American employees. Id. Plaintiff alleges that she and approximately six other African-American coworkers wrote letters to human resources complaining about favoritism and unfair treatment in the office. Dkt. # 42-2, at 16-17. According to plaintiff, "African-Americans were disciplined for conduct that went unpunished when committed by other non African-American coworkers." Id. She offers the example of "Sheniqua," an African-American woman who had been fired for poor attendance, when Welker and another Caucasian employee "never got wrote [sic] up, never got fired." Dkt. # 25-3, at 18. Plaintiff claims that she did not report these concerns to her supervisors Wear and Ghere because "nothing ever seemed to happen." Dkt. # 42-2, at 4. Plaintiff supports these claims with her deposition testimony. See id. at 16-25.

Plaintiff also claims that she, specifically, was not treated the same as her Caucasian comparators, who were discharged and then reinstated. Dkt. # 42, at 2. Plaintiff claims that Wear treated her unfairly and favored other Caucasian employees. Dkt. # 42-2, at 22. Plaintiff claims that Wear also mischaracterized her behavior during the interviews. She avers that she was not

5

insubordinate or uncooperative, and that these labels are merely pretextual. Dkt. # 42, at 4. Plaintiff supports her assertion with the testimony of herself and Thomas. Thomas stated that he did not know whether he personally felt plaintiff "was being uncooperative during the interview." Dkt. # 42-4, at 3.

Plaintiff also distinguishes her termination from Bevenue's. According to plaintiff, who was Bevenue's team leader, "Bevenue was on probation at the time of her ultimate termination." Dkt. # 42, at 4, 7. Defendant contests this allegation and proffers Ghere's affidavit, in which Ghere states that "Bevenue was not on probation for her attendance and productivity or for any other reason at the time of the termination of her employment on September 15, 2005 and she was never on probation at any time during her employment with St. John."[2] Dkt. # 43-2, at 1.

## II. Standard of Review

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Kendall v. Watkins</u>, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

---

[2]  In support of Ghere's affidavit, defendant proffers Bevenue's performance appraisals from October 2002, 2003, and 2004. <u>See</u> Dkt. # 43-2, at 3-12. Defendant does not proffer a performance appraisal for 2005, however, as Bevenue was terminated before October, apparently the month for annual reviews.

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III. Analysis

Plaintiff claims defendant terminated her because of her race in violation of Title VII and § 1981. Title VII makes it unlawful for an "employer . . . to discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that equal rights shall be given to "[a]ll persons within the jurisdiction of the United States." Id. § 1981. To survive summary judgment under Title VII and § 1981, plaintiff must satisfy the McDonnell Douglas burden shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); see Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1166-67 (10th Cir. 2007); Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000); Thomas v. Denny's Inc., 111

F.3d 1506, 1509 (10th Cir. 1997). Initially, plaintiff must establish a prima facie case of employment discrimination. McDonnell Douglas, 411 U.S. at 802. Once plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Id. at 803; Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981); English v. Colorado Dept. of Corrs., 248 F.3d 1002, 1009 (10th Cir. 2001). If defendant makes this showing, the burden shifts back to plaintiff to show that defendant's stated nondiscriminatory reason is mere pretext for unlawful discrimination. Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1114-15 (10th Cir. 2007); Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).

### A. Prima Facie Case

To establish a prima facie case, plaintiff must show that she (1) belongs to a protected class; (2) was qualified for the position; and (3) was discharged despite her qualifications.[3] Swackhammer, 493 F.3d at 1166; Green v. New Mexico, 420 F.3d 1189, 1192 n. 3 (10th Cir. 2005). "[T]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." Kendrick, 220 F.3d at 1227 (internal quotations marks and citations omitted). If

---

[3] This Court recognizes that the Tenth Circuit is split as to whether a fourth element, namely, that plaintiff's position was not thereafter eliminated, is required. See Swackhammer, 493 F.3d at 1166 n.8; see also Antonio v. Sygma Network Inc., 458 F.3d 1177, 1183 n.3 (10th Cir. 2006); Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005); Kendrick, 220 F.3d at 1229. Swackhammer noted, however, that in a discriminatory discharge case, if the employer fired the employee because of unsatisfactory conduct, "the status of the employee's former position after his or her termination is irrelevant." 493 F.3d at 1166 n.8 (internal quotation marks and citation omitted).

8

plaintiff establishes a prima facie case, a presumption of discrimination arises. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Here, for the purposes of summary judgment only, the parties agree that plaintiff has established her prima facie case: (1) Maston, as an African-American woman, belongs to a protected class; (2) St. John terminated Maston's employment, and (3) Maston was qualified by reason of training and background for the team leader position. See Dkt. # 25, at 14. Thus, defendant must proffer a legitimate, nondiscriminatory justification for plaintiff's termination.

### B.  Legitimate, Nondiscriminatory Justification

At this stage, the employer need not rebut evidence established under the first step; it must only rebut the inference that it acted out of discriminatory animus. E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1318 (10th Cir. 1992). The ultimate burden of proving discrimination remains at all times on plaintiff. Burdine, 450 U.S. at 253. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." Flasher, 986 F.2d at 1316 (emphasis added). If defendant carries its "exceedingly light" burden of production, Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165 (10th Cir. 2007), the presumption of discrimination drops out of the case, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).

Here, defendant avers that it discharged plaintiff because of the legitimate, nondiscriminatory reason of insubordination and lack of cooperation in an investigation. Dkt. # 25, at 14. The Employee Handbook defines insubordination as the "willful refusal to follow direct orders." Dkt.

9

# 42-7, at 3. Plaintiff argues that at no time during the investigation did she refuse to follow orders. Dkt. # 42, at 8. According to plaintiff, she met with Wear and Thomas through a phone meeting and in a face-to-face meeting on two separate days and answered the questions asked, id. at 8-9, and "told Wear and Thomas everything she knew," id. at 9.

The Court finds that plaintiff's argument is misplaced and, quite simply, ignores Tenth Circuit precedent. At this stage in the analysis, defendant's burden is merely one of production, Zamora, 478 F.3d at 1165, and defendant must proffer only a <u>facially</u> nondiscriminatory reason for the termination.[4] Flasher, 986 F.2d at 1316. For example, "an employer could not advance as the reason for more seriously disciplining the plaintiff that he or she was black." Id. at 1316 n.4. Here, however, defendant claims that insubordination and failure to cooperate with an investigation — not race — justified plaintiff's termination. Thus, the burden now shifts to plaintiff to show that defendant's stated nondiscriminatory reason is mere pretext for unlawful discrimination.

## C. Pretext

To show pretext, plaintiff must produce evidence that would, if believed by the trier of fact, show that the true reason for the action was discriminatory. Plaintiff may produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997). Plaintiff can demonstrate pretext by showing: (1) falsity in defendant's stated justification for the adverse

---

[4] The pretext prong of the McDonnell Douglas framework addresses the veracity of defendant's proffered justification. See discussion infra Part II.C.1.

10

employment action; or (2) differential treatment of plaintiff and a similarly-situated employee who committed an offense of comparable seriousness. Swackhammer, 493 F.3d at 1167-68; Kendrick, 220 F.3d at 1230. While "all doubts concerning pretext must be resolved in plaintiff's favor, [plaintiff's] allegations alone will not defeat summary judgment." Morgan, 108 F.3d at 1324. To defeat summary judgment, plaintiff must offer more than "[m]ere conjecture that the employer's explanation is pretext." Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

Here, plaintiff challenges defendant's proffered justification on both falsity and differential treatment grounds. Plaintiff makes several arguments: (1) defendant's proffered explanation is unworthy of credence (false) because plaintiff's actions did not qualify as insubordinate; (2) other similarly-situated Caucasian employees who committed offenses of comparable seriousness did not receive the same treatment; and (3) Wear and Ghere treated other African-American employees differently than nonminority employees. The Court will address plaintiff's falsity allegations first.

### 1. Falsity

Plaintiff may demonstrate falsity "by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)). The Tenth Circuit has held that "the factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions – simply disbelieving the employer is insufficient." Young v. Dillon Cos., 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111 (10th Cir. 2005)) (internal quotation marks omitted) (emphasis in original). The relevant question is not whether defendant's proffered justification is "wise, fair or

11

[even] correct," but whether defendant "honestly believed those reasons and acted in good faith upon those beliefs." Id. (internal quotation marks and citation omitted). A pretext challenge requires a court "to look at the facts as they appear[ed] to the person [who] ma[de] the decision to terminate plaintiff." Kendrick, 220 F.3d at 1231. A court's "role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." Young, 468 F.3d at 1250.

Here, plaintiff challenges the truthfulness of defendant's proffered explanation. Dkt. # 42, at 8-9, 14. She claims she did not behave in an insubordinate manner, as defined in the Employee Handbook,[5] and supports her argument with her testimony, her affidavit, and Thomas' statement that he did not know whether he personally felt plaintiff "was being uncooperative during the interview." Dkt. # 42-4, at 3. Plaintiff argues that at no time during the investigation did she willfully refuse to follow orders. Dkt. # 42, at 8. Plaintiff met with Wear and Thomas through a phone meeting and in a face-to-face meeting on two separate days and answered the questions asked. Id. at 8-9. According to plaintiff, she "told Wear and Thomas everything she knew." Id. at 9.

The Court finds that plaintiff has not proffered sufficient evidence to establish that defendant's justification is unworthy of credence. Plaintiff's argument ignores her own deposition testimony that, during the interview with Thomas and Wear, she used at least one curse word, stopped talking at some point because she "just got tired of [answering] the same questions over and over again," and became visibly upset. Dkt. # 42-2, at 13. The relevant question here is not whether defendant's assessment of plaintiff's behavior was "wise, fair or [even] correct," but whether

---

[5] The Employee Handbook defines insubordination as the "willful refusal to follow direct orders." Dkt. # 42-7, at 3.

defendant "honestly believed those reasons and acted in good faith upon those beliefs." Young, 468 F.3d at 1250 (internal quotation marks and citation omitted). Defendant's beliefs are evidenced in Ghere's affidavit and plaintiff's termination notification, which plainly state that defendant terminated plaintiff because of her insubordinate and uncooperative behavior. See Dkt. # 25-2, at 2, 5. Security officer Thomas' statement about his personal beliefs is immaterial to this inquiry; management — not the security officer — made the termination decisions. See Dkt. # 42-4 at 3. In sum, this Court's role is not to second guess employers' honestly held (even if erroneous) business judgments. Young, 468 F.3d at 1250. Plaintiff has not established a genuine issue of material fact as to the veracity of defendant's proffered justification.

## 2.  Differential Treatment

Plaintiff may also demonstrate pretext by providing evidence that he or she "was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." Kendrick, 220 F.3d at 1232. Employees qualify as similarly-situated "if the employee[s] deal[] with the same supervisor and [are] subject to the 'same standards governing performance evaluation and discipline.'" Id. (quoting Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997)). Similarly-situated employees should share "relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006); see Green, 420 F.3d at 1194.

Here, the Court finds that plaintiff has failed to create a genuine issue of material fact with regard to differential treatment. First, the Court finds that for purposes of summary judgment, Taylor, Welker, and Bevenue were similarly-situated with plaintiff as to their employment

classification for disciplinary purposes. Plaintiff claims that she, Welker, Taylor, and Bevenue were hourly employees in the same billing office who dealt with the same supervisors, Wear and Ghere, and were subject to the same Employee Handbook policies. Dkt. # 42, at 11. The version of the Employee Handbook proffered by plaintiff, which appears to be the more current version,[6] supports her assertion. See Dkt. # 42-7. Defendant admits that Welker, Taylor, and Bevenue were hourly employees in the same billing office who dealt with the same supervisors as plaintiff. See Dkt. # 43, at 11. Yet defendant contends that plaintiff's team leader status distinguished her from Taylor, Welker, and Bevenue. Plaintiff was a team leader, which defendant alleges qualified her as a "manager." Dkt. # 43, at 6. The Employee Handbook does not, however, specify any distinct policy or classification for team leaders. See Dkt. # 25-5, at 10-11. Further, defendant does not dispute anywhere in the record that plaintiff, in fact, lacked the authority to hire, fire, or promote any other employee. While the Court notes that Ghere's affidavit states that "Maston as a Team Leader was subject to different standards regarding her performance evaluation and discipline," Dkt. # 25-2, at 2, the Court finds that this conclusory statement is unsupported by any documentation in the record, including the Employee Handbook. Thus, plaintiff's title of "team leader" would not appear to place her in a managerial or upper-level position. The Court finds that Taylor, Welker, Bevenue, and plaintiff were "subject to the 'same standards governing performance evaluation and discipline.'" Kendrick, 220 F.3d at 1232 (citation omitted).

---

[6] The version of the Employee Handbook proffered by plaintiff was issued by St. John Health System. See Dkt. # 42-7, at 1. Defendant's version, dated October 1996, on the other hand, was issued by St. John Medical Center. See Dkt. # 25-2, at 10. Defendant's current name is St. John Health System.

Nonetheless, plaintiff argues that she and Bevenue were not similarly-situated because "Bevenue was on probation at the time of her ultimate termination." Dkt. # 42, at 4, 7. Defendant contests this allegation and proffers Ghere's affidavit, in which Ghere states that "Bevenue was not on probation for her attendance and productivity or for any other reason at the time of the termination of her employment on September 15, 2005 and she was never on probation at any time during her employment with St. John." Dkt. # 43-2, at 1. In light of Ghere's affidavit, the Court finds that plaintiff has not proffered sufficient evidence to support her claim about Bevenue. Ghere, not plaintiff, possessed managerial powers such as the authority to hire, fire, or promote any other employee. Dkt. # 42-2, at 28. Ghere, not plaintiff, would have been in the best position of knowing whether an employee was on probation. Ghere's affidavit, therefore, carries greater weight than plaintiff's unsupported, speculative claim regarding Bevenue's probationary status.

Second, the Court finds that Taylor, Welker, Bevenue, and plaintiff, as a group, did not commit comparable violations of similar work rules. To the extent that they did, the Court finds that they received similar treatment. Defendant terminated plaintiff and Bevenue because of their insubordination and failure to cooperate with the investigation of the past-due invoice. The Employee Handbook lists "insubordination," defined as the "willful refusal to follow direct orders," as behavior that may result in immediate termination. Dkt. # 42-7, at 2-3. The Employee Handbook also lists "Failure to cooperate with an investigation" as grounds for immediate termination. <u>Id.</u> Unlike plaintiff and Bevenue, Welker and Taylor were not terminated for insubordination or

15

uncooperative behavior, but for their "use [of] poor judgment" in placing earlier catalog orders.[7] Dkt. # 25-2, at 8-9; see Dkt. # 25-2, at 2. Although the Employee Handbook does not specify whether certain violations are more serious than others, this fact does not change the analysis. Plaintiff and Bevenue were terminated for their insubordination and failure to cooperate during the investigation of the past-due invoice; Welker and Taylor were terminated for entirely different behavior. Hence, defendant's reinstatement of Welker and Taylor can be explained on nondiscriminatory grounds: Welker and Taylor cooperated in the investigation and were found not to be involved in the past-due invoice. Dkt. # 25-2, at 2. The same cannot be said for plaintiff and Bevenue. Thus, the Court finds that Welker and Taylor did not commit violations similar to those of plaintiff and Bevenue.

Even if they did, however, plaintiff still received the same treatment as Bevenue, a Caucasian coworker who violated the same work rules. Defendant discharged both women on the same day for the same reason: insubordination and failure to cooperate during the investigation. Dkt. # 25-2, at 5, 7. Wear and Ghere believed that both women failed to give complete answers during the investigation. The termination notifications stated that both women asked if they needed lawyers. The parties do not dispute the significant similarity between plaintiff's and Bevenue's interviews: (a) both women claimed they were being harassed; (b) both women stopped answering the repetitive questions at some point; and (c) both women became aggravated. See id. at 5-7; Dkt. # 25-5, at 9.

---

[7] While defendant does not specify under which of the grounds set forth in the Employee Handbook Welker and Taylor were terminated, it is undisputed that Welker and Taylor were discharged due to their admitted involvement in earlier orders from the catalog company. See Dkt. # 25, at 8; Dkt. # 42, at 2.

Further, it is undisputed that defendant has reinstated neither plaintiff nor Bevenue.[8] Thus, the Court finds that plaintiff has not created a genuine issue of material fact with regard to differential treatment.

Finally, with regard to plaintiff's third argument regarding defendant's treatment of other African-American employees, the Court finds that plaintiff has not created a genuine issue of material fact. Plaintiff has not produced even one of the letters she claims exist that document the alleged unfair treatment and favoritism. Plaintiff has not offered even one affidavit or deposition transcript from the anonymous African-American employees, who allegedly wrote these letters. With regard to "Sheniqua," the African-American woman who was fired for poor attendance, plaintiff offers nothing more than her testimony to support her claim. In sum, plaintiff has offered "no independent evidence, beyond [her] mere conjecture, that would allow a reasonable factfinder to infer that [racial] discrimination was the actual motivation for her termination." Swackhammer, 493 F.3d at 1172; see Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) ("[P]laintiff['s] mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").

---

[8] The Court finds that the subtle nuances in plaintiff's and Bevenue's termination notifications do not create a genuine issue of material fact. For example, Wear checked the "No" and "Not in this Department" boxes under "eligibility for re-employment" on Bevenue's termination notification. Dkt. # 25-2, at 6. On plaintiff's termination notification, on the other hand, Wear simply checked the "No" box under eligibility for rehire. Dkt. # 25-2, at 5. This scintilla of evidence of differential treatment, alone, will not overcome summary judgment. While these two forms raise the question of whether Bevenue may be eligible for rehire in another department, the undisputed fact in the record is that defendant has not reinstated either woman. Plaintiff has offered nothing to show that defendant actually treated her differently than her comparator, Bevenue.

### III.  Conclusion

The Court finds that plaintiff has failed to establish a genuine issue of material fact as to her claims; therefore, defendant is entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 24) is **granted**.  Defendant's motion in limine (Dkt. # 33) is **moot**.  A separate Judgment is entered herewith.

**DATED** this 30th day of January, 2008.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT